EXHIBIT C

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MARK CAMPBELL; SHERRIE CAMPBELL,
      *Plaintiffs-Appellees*,

v.

CHEATHAM COUNTY SHERIFF'S DEPARTMENT, et al.,
      *Defendants*,

JAMES DOUGLAS FOX,
      *Defendant-Appellant*.

No. 21-5044

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:19-cv-00151—Waverly D. Crenshaw, Jr., District Judge.

Argued: May 4, 2022

Decided and Filed: August 29, 2022

Before: BOGGS, GIBBONS, and NALBANDIAN, Circuit Judges.

_____

COUNSEL

**ARGUED:** Robyn Beale Williams, FARRAR & BATES LLP, Nashville, Tennessee, for Appellant. John H. Morris, NASHVILLE VANGUARD LAW PLLC, Nashville, Tennessee, for Appellees. **ON BRIEF:** Robyn Beale Williams, FARRAR & BATES LLP, Nashville, Tennessee, for Appellant. John H. Morris, NASHVILLE VANGUARD LAW PLLC, Nashville, Tennessee, Andrew S. Lockert, LOCKERT LAW, PLLC, Ashland City, Tennessee, for Appellees.

    GIBBONS, J., delivered the opinion of the court in which BOGGS, J., joined. NALBANDIAN, J. (pp. 16–27), delivered a separate dissenting opinion.

# OPINION

JULIA SMITH GIBBONS, Circuit Judge. Mark and Sherrie Campbell filed a complaint under 42 U.S.C. § 1983 against the Cheatham County Sheriff's Department, the Municipal Government of Cheatham County, Cheatham County Sheriff Mike Breedlove, and Officers James Fox and Christopher Austin. The district court granted summary judgment for all defendants except Fox, concluding that Fox was not entitled to qualified immunity on the Campbells' excessive force claim against him. Fox appeals, and we affirm.

I

On August 21, 2018, around 9:15 p.m., Fox and Austin were dispatched to the Campbells' residence to conduct a welfare check after a 9-1-1 dispatcher received two hang-up calls from a phone located on the property. They arrived at the Campbells' home around 9:39 p.m. They did not activate the emergency lights on their cars but kept their headlights pointed toward the house.

Fox walked up onto the small porch and knocked on the front door. He did not announce himself as law enforcement. The district court compiled a useful table of what occurred next, which we adopt here after confirming its accuracy with video footage[1] and the other record evidence.

| Seconds Elapsed | Description of Event |
|---:|---|
| 0 | Fox knocks three times |
| 1–5 | Fox walks down the steps and stands next to Austin |
| 10 | Mark says, "You got a gun?" through the closed door |
| 12–17 | Fox unholsters his gun and walks to the other side of Austin while saying, "Mark . . . come on out Mark, what's up man?" |
| 18 | Mark again says, "You got a gun?" |
| 21 | Fox says, "What's going on Mark?" |

---

[1]The video footage includes both officers' body cameras and the dashboard camera in Fox's vehicle.

| | 23 | Mark says, "I got one too." |
|---|---|---|
| | 24–25 | Fox draws his gun and turns his back to the door as he walks behind Austin |
| | 26 | Mark begins to open the door |
| | 27 | Fox turns quickly back toward the door |
| | 28 | Fox says, "Do what Mark?" and then fires two shots toward the door in rapid succession |
| | 29 | Austin trips or jumps to the ground |
| | 30 | Fox says, "You good?" |
| | 31 | Fox fires six shots toward the door in rapid succession |

*Campbell v. Cheatham Cnty. Sheriff's Dep't*, 511 F. Supp. 3d 809, 814 (M.D. Tenn. 2021) (footnotes omitted).

The parties dispute what the officers saw when Mark began to open the door, and the video footage does not resolve the dispute. Mark says he may have had a cell phone in his hand, but not a gun. Both officers contend they thought Mark had a gun. However, there is evidence that on the evening of the incident, the officers did not know what, if anything, Mark was holding.

Following Fox's first shots, Mark fell to the floor and kicked the door shut. He yelled to his wife, Sherrie, to call 9-1-1 because somebody was shooting at them. Sherrie was asleep in the bedroom, woke to gunshots, and heard her husband yelling. She called 9-1-1. Although Fox fired eight shots at the home, no one was hit.

After the shots, Fox and Austin made their way behind Fox's car as Fox reported over the radio that shots were fired. Mark yelled profanities through the closed door. A few minutes later, Mark walked onto his porch holding a flat reflective rectangular item. Fox and Austin yelled at Mark to get on the ground and show his hands. Mark yelled that his phone was in his hand and lifted his empty left hand. He yelled that he was not getting on the ground, to shoot him, and profanities, before returning inside his home. Mark opened the door again a minute later and stood in the doorway as he appeared to talk on the phone and pointed at the officers. Again, Fox and Austin yelled at Mark to show his hands. Mark yelled back and then returned inside and shut the door.

Several other officers soon arrived at the Campbells' home, and one of them apprehended Mark in the yard of the home. After Mark's arrest, Fox, Austin, and a detective went inside the home. They told Sherrie, who was still in the bedroom, to come out with her hands visible. Sherrie complied, and the officers detained her while they cleared the house. No firearms were found in the home. Mark was charged with two counts of aggravated assault, both of which were ultimately dismissed.

The Campbells sued Fox in his individual capacity for excessive use of force under 42 U.S.C. § 1983. Fox argued that the statute of limitations barred the Campbells' § 1983 claim and that he was entitled to qualified immunity because (1) he did not seize the Campbells within the meaning of the Fourth Amendment, and (2) his use of force was objectively reasonable. The district court disagreed with each of these arguments. Fox appealed. We decline to exercise jurisdiction over Fox's statute of limitations argument, and we affirm the district court's denial of summary judgment.

## II

"We review de novo a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013). Summary judgment is appropriate only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see* Fed. R. Civ. P. 56(a). We view the facts and reasonable factual inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where there is video footage of an incident, we view the facts in the light depicted by any unambiguous footage. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

## III

Fox contends that the district court erred in denying him summary judgment because the Campbells' § 1983 claim is barred by the statute of limitations and because he is entitled to qualified immunity.

### A

Fox argues Tennessee's one-year statute of limitations applies to the Campbells' § 1983 claim. We lack jurisdiction to address this argument.

We have jurisdiction to review "final decisions" from the district courts. 28 U.S.C § 1291. Under the collateral order doctrine, however, some interlocutory orders are immediately appealable, because they amount to final decisions. *United States v. Mandycz*, 351 F.3d 222, 224 (6th Cir. 2003). Such orders include only "decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)). An order must satisfy all three of these requirements to be appealable under the collateral order doctrine. *Id.*

The district court determined the Campbells' § 1983 claim was timely under the applicable statute of limitations. "A statute of limitations is not an immunity from suit; it is a defense to liability." *DeCrane v. Eckart*, 12 F.4th 586, 601 (6th Cir. 2021). Therefore, Fox's argument on the statute of limitations can be effectively reviewed after a final judgment. As this issue does not satisfy the requirements under the collateral order doctrine, we lack jurisdiction to review it.[2] *See id.* at 601–02.

### B

We turn to qualified immunity. Unlike the statute of limitations defense, qualified immunity enables a defendant to avoid litigating a dispute. *DeCrane*, 12 F.4th at 601. We may "review the district court's interlocutory denial of qualified immunity only to the extent that it turns on an issue of law." *Stoudemire*, 705 F.3d at 564.

The Campbells alleged that Fox violated their constitutional rights by using excessive force against them. Fox, as a government official, is entitled to qualified immunity from this

---

[2] We have exercised pendent appellate jurisdiction over issues that are inextricably intertwined with qualified immunity. *DeCrane*, 12 F.4th at 602. We decline to do so here, as Fox has not invoked our discretionary pendent appellate jurisdiction and his statute of limitations defense is not inextricably intertwined with qualified immunity. *Id.*

claim unless the Campbells can show that Fox violated a constitutional right that was clearly established at the time of his alleged misconduct. *Id.* at 567.

### 1

We start with the constitutional right. A § 1983 claim of excessive force implicates "either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Where, as here, "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen," it invokes "the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Id.* (quoting U.S. Const. amend. IV). Fox contends the Campbells cannot establish a violation of the Fourth Amendment because they were not seized.

A seizure can occur in one of two ways: (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control. *Torres v. Madrid*, 141 S. Ct. 989, 998, 1001 (2021). The first type covers uses of physical force, such as when an officer shoots an individual. *Id.* at 999. Had Fox's shots hit the Campbells, then they would have been seized under this category. Since Fox missed and there was no physical contact, we look to the second type—acquisition of control. As the Supreme Court has explained, "[u]nlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." *Id.* at 1001. The parties do not dispute that Fox showed authority by firing eight shots into the Campbells' home, but Fox contends that the Campbells did not submit to this show of authority, and thus were not seized.

What constitutes a submission to a show of authority or a termination of freedom of movement? If an officer rams a suspect's car off the road or locks a suspect in a room, the officer has terminated the suspect's freedom of movement and seized the suspect under the Fourth Amendment. *See id.* Alternatively, if an officer orders an individual to stop but the individual continues running away, then there has been no seizure, because there has been no

submission to authority or termination of movement. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991). As the Supreme Court has recognized, "when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not." *Brendlin v. California*, 551 U.S. 249, 255 (2007). The Court explained that "a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "Examples of circumstances that might indicate a seizure" include "the threatening presence of several officers [or] the display of a weapon by an officer." *Mendenhall*, 446 U.S. at 554.

In view of all the circumstances here, a reasonable person would not believe that he or she was free to leave a house while an officer repeatedly fired at the front door.[3] We considered a similar situation in *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002). In *Ewolski*, John Lekan had a standoff with the police at his home. *Id.* at 498–500. "The district court concluded that Mr. Lekan was not seized, because by barricading himself in his home he never submitted to official authority." *Id.* at 506. We held that this conclusion was erroneous, because under the circumstances, Lekan was not free to leave. *Id.* As we explained, "although Mr. Lekan was never in police custody, the police surrounded the house and paraded an armored vehicle in front of the Lekans' house." *Id.* "These actions qualify as an intentional application of physical force and show of authority made with the intent of acquiring physical control" and "this assertion of force and authority succeeded in restraining Mr. Lekan's liberty to leave his home." *Id.* In this case, when Fox fired immediately and repeatedly upon Mark opening the door, Fox terminated the Campbells' movement and "a reasonable person would have believed that he was not free to leave." *Brendlin*, 551 U.S. at 255 (citation omitted). Therefore, the Campbells were seized within the meaning of the Fourth Amendment.

Fox attempts to analogize this case to cases in which officers' missed shots failed to stop a fleeing suspect. We rejected this same argument in *Ewolski*, explaining that "[u]nlike the

---

[3]The dissent states, "Mark evidently felt differently." Dis. Op., at 18. But the test established in *Mendenhall* is objective: "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628.

fleeing suspects [in other cases,] Mr. Lekan was not 'on the loose.'" 287 F.3d at 506. Like Lekan, the Campbells were not "on the loose," but rather confined to their home because of Fox's show of authority. *See id.* The dissent distinguishes *Ewolski*, emphasizing that Mark was on the loose because he walked onto his front porch and yard. Dis. Op., at 20. We find Mark's limited range of movement onto the curtilage of his home more in line with the facts of *Ewolski* than the fleeing cases in which suspects ran away from chasing officers.

In analyzing whether conduct constitutes submission to a show of authority, we also look to "what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262. When Fox shot at their front door, the Campbells effectively submitted to his show of authority by remaining in their home. Fox emphasizes that Mark later came out to his front porch, yelled profanities, and went out to his yard. This limited range of movement is factually distinguishable from the cases in which a suspect is fleeing by running or driving away from officers. *See Floyd v. City of Detroit*, 518 F.3d 398, 405–06 (6th Cir. 2008); *cf. Hodari D.*, 499 U.S. at 622–23; *Adams v. City of Auburn Hills*, 336 F.3d 515, 517, 518–20 (6th Cir. 2003). Moreover, Mark's subsequent actions on his porch and in his yard are of little use in determining whether the Campbells were seized at the time that Fox fired his weapon, because a seizure is "a single act, and not a continuous fact," and an individual may be seized for a brief time despite later demonstrating freedom of movement. *Torres*, 141 S. Ct. at 1002 (quoting *Hodari D.*, 49 U.S. at 625). The dissent contends we fail to look at what occurred after the gunshots, erasing the distinction between seizures by control and seizures by force. Dis. Op., at 17. We, of course, look to what the Campbells did in response to Fox's show of authority. They took cover in their home. The dissent focuses on Mark's actions minutes later when he came onto his porch. But the events immediately following the gunshots is of greater value in determining whether the Campbells were seized because a seizure is a discrete moment, and not a continuous chain of events. We do not ignore what happened next. Rather, we emphasize that what occurred immediately is more informative than what occurred later in time. By remaining on their property rather than leaving after shots were fired at their door, the Campbells submitted to Fox's show of authority and were restricted in their movement.

It also makes no difference whether Fox knew Sherrie was also inside the home. We have explained that when an officer seizes one person by shooting at a car, for example, the officer seizes everyone in the car, even if the officer is unaware of the presence of passengers. *Rodriguez v. Passinault*, 637 F.3d 675, 686–87 (6th Cir. 2011); *Fisher v. City of Memphis*, 234 F.3d 312, 318–19 (6th Cir. 2000); *see also Brendlin*, 551 U.S. at 254–59. The same logic extends to the home: just as shooting at a car and causing it to stop terminates the freedom of movement of everyone in the car, so does shooting into a house in a manner that prevents occupants from leaving constitutes a seizure of the occupants. By shooting at the house, Fox seized everyone inside, including Sherrie.[4]

The dissent analogizes this case to *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011). Dis. Op., at 22–23. In *Bletz*, officers went to the Bletz family home to execute a warrant for Zachary Bletz's arrest. 641 F.3d at 747. While waiting for Zachary to secure his dog, officers waited in the breezeway of the home and saw a man pointing a gun at them. *Id.* This was Zachary's father, Fred Bletz, who had poor vision and hearing. *Id.* at 748. Officers shot him. *Id.* Officers then moved into the home where they handcuffed Zachary and his mother, Kitti Bletz, before placing them in police cars. *Id.* Kitti alleged her Fourth Amendment rights were violated. *Id.* We held that "it is indisputable that Kitti was seized within the meaning of the Fourth Amendment when defendants handcuffed her and placed her inside a locked police vehicle." *Id.* at 754. The dissent contends this shows that Kitti was not seized before this moment. Dis. Op., at 22–23. *Bletz* did not engage in any analysis of whether everyone in the house was seized when the officers started shooting, so the same issue was not before the court. But, regardless, unlike our case, officers did not shoot multiple rounds at the Bletz family home's front door. Rather, officers were already inside the breezeway of the home and shot directly at one person in response to that person pointing a weapon at them. *Bletz* does not address the same seizure issues presented here.

---

[4]In *Ewolski*, this court held Lekan's wife and child, who were also trapped in the home, were not seized because "[t]heir movement was restrained by Mr. Lekan . . . not by the police." 287 F.3d at 507. In fact, the police were attempting to "remove them from the house and remove them from the control of Mr. Lekan." *Id.* But in this case, Fox's gunshots, rather than Mark's actions, confined Sherrie to her home. The dissent disagrees and contends Mark kept Sherrie in the house, because he told her to stay put. Dis. Op., at 22. But, of course, Mark told Sherrie not to move because Fox was shooting at the home.

"When an officer fires a gun at a person," but "the bullet does not hit the person, the 'show of authority . . . ha[s] the intended effect of contributing to [the person]'s immediate restraint'" and under our caselaw is a seizure." *Jacobs v. Alam*, 915 F.3d 1028, 1042 (6th Cir. 2019) (alterations in original) (quoting *Thompson v. City of Lebanon*, 831 F.3d 366, 371 (6th Cir. 2016)). By firing at the Campbells' home, Fox made a show of authority. This show of authority restricted the Campbells' movement such that a reasonable person, under these circumstances, would not feel free to leave.[5] Therefore, Fox seized the Campbells under the Fourth Amendment.

2

Having established that Fox seized the Campbells, we turn to whether a reasonable jury could conclude that Fox's use of force was excessive, in violation of the Fourth Amendment. As this is an interlocutory appeal, Fox "must be willing to concede the most favorable view of the facts to the [Campbells] for purposes of the appeal." *Jacobs*, 915 F.3d at 1039 (citation omitted). If Fox fails to do so, we may exercise jurisdiction only over "the purely legal question of whether the facts alleged support a claim of violation of clearly established law." *Id.* at 1039–40 (citation omitted).

"We have authorized the use of deadly force 'only in rare instances'" in which "the 'officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* at 1040 (citations omitted). We look at the circumstances of each case to determine the reasonableness of the use of force, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The Campbells had committed no crime and were not evading arrest when Fox used deadly force—leaving only the threat factor for our consideration. The threat factor "is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe

---

[5]For this inquiry, it is irrelevant whether Mark or Sherrie knew the individual shooting at the door was a law enforcement official, because the inquiry is objective and does not "depend on the subjective perceptions of the seized person." *Torres*, 141 S. Ct. at 999.

physical harm.'" *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (citation omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 12–13 (1985). We make an objective assessment based on the perspective of a reasonable officer in Fox's position. *See Jacobs*, 915 F.3d at 1040–41.

Viewing the facts in the light most favorable to the Campbells, Fox and Austin arrived at the Campbells' home in the evening to conduct a welfare check. Fox, without announcing himself as an officer, knocked on the front door. Mark asked, "You got a gun?" Fox asked Mark, "What's going on?" Mark said, with the door still closed, "I got one too." Mark slightly opened the door and Fox immediately began firing his weapon. Under these facts, a reasonable officer would not have believed deadly force was justified, as there was no probable cause to believe that Mark posed a threat to anyone's safety simply by virtue of informing the officers that he had a gun and then opening the door as they asked him to do. *See Floyd*, 518 F.3d at 405–07; *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996).

Fox emphasizes that Mark said he had a gun. But under our precedent, mere possession of a weapon is not sufficient to justify the use of deadly force. *Jacobs*, 915 F.3d at 1040. Rather, there must be additional indicia that the safety of the officer or others is at risk. *See, e.g., Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020) (individual pointed a rifle at the officer's face); *Thomas v. City of Columbus*, 854 F.3d 361, 365–66 (6th Cir. 2017) (individual suspected of committing a burglary ran with a gun in hand toward a lone officer in a high-crime area). Fox nonetheless contends that two of our cases support his use of deadly force as reasonable: *Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015) and *Simmonds v. Genesee County*, 682 F.3d 438 (6th Cir. 2012). In *Pollard*, we concluded that an officer's use of deadly force was objectively reasonable where the suspect clasped his hands in a shooting posture and pointed it at the officers after engaging in a dangerous car chase and ignoring multiple commands. 780 F.3d at 400, 403–04. In *Simmonds*, we concluded that an officer's use of deadly force was reasonable where the suspect brandished a silver object while yelling "I have a gun" after the suspect threatened to kill others, ignored repeated orders, and fled from officers. 682 F.3d at 445. *Pollard* and *Simmonds* thus provide examples of circumstances extending beyond mere possession of a weapon that would lead a reasonable officer to believe there was a threat to the safety of others. Without these additional circumstances, the fact that an individual states that he

has a weapon, or even in fact possesses a weapon, is not enough to justify the use of deadly force. *See Lee v. Russ*, 33 F.4th 860, 863–66 (6th Cir. 2022); *Jacobs*, 915 F.3d at 1040; *King v. Taylor*, 694 F.3d 650, 663–64 (6th Cir. 2012); *Bradenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989); *see also Knowlton v. Richland Cnty.*, 726 F. App'x 324, 326–27, 331 (6th Cir. 2018); *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 424–25 (6th Cir. 2017). Viewing the evidence in the light most favorable to the Campbells, no additional circumstances existed during the incident that would lead a reasonable officer to believe that the Campbells posed a safety risk to others.

Fox additionally contends that he believed Mark was holding a gun when Mark began opening the door. However, this is a genuine dispute of fact, as Mark contends that he was not holding a gun[6] and there is evidence in the record that the officers did not know what, if anything, Mark was holding. We lack jurisdiction to resolve the factual dispute over what Fox perceived that evening when Mark slightly opened the door. *See Jacobs*, 915 F.3d at 1041; *Floyd*, 518 F.3d at 404; *Graves v. Malone*, 810 F. App'x 414, 422–23 (6th Cir. 2020). Accepting the Campbells' version of the facts, a reasonable jury could find that Fox's use of deadly force was objectively unreasonable. Therefore, we turn to whether the right was clearly established.

### 3

An officer is not entitled to qualified immunity if he violates a constitutional right "so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Bouggess v. Mattingly*, 482 F.3d 886, 894 (6th Cir. 2007) (quoting *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987)).

The use of excessive force in a seizure is a violation of the Fourth Amendment. *See Graham*, 490 U.S. at 394. And "[i]t has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *Jacobs*, 915 F.3d at 1040 (citation omitted). In some "obvious" cases, these general standards are sufficient to clearly establish that an officer's conduct is unconstitutional, even

---

[6] No gun was found in the search of the Campbells' home.

"without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam). More often, however, decisions at this level of generality are insufficient to indicate whether the law clearly establishes that an officers' use of force is unreasonble. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). Instead, we look to the law at the time of the officer's conduct and identify the "existing precedent [that] 'squarely governs' the specific facts at issue." *Id.* at 1153 (citation omitted). There need not be "a case directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 1152 (citation omitted). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Id.* at 1153 (citation omitted). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (citation omitted).

In the light most favorable to the Campbells, this may be an obvious case in which the general rule on use of deadly force, enunciated in *Garner*, provided sufficient notice to Fox that his conduct was unlawful. *See Garner*, 471 U.S. at 12–13. But we need not resolve that issue because, viewing the record in the light most favorable to the Campbells, *Floyd*, 518 F.3d at 398, decided a decade before the incident here, clearly establishes that Fox's conduct was unconstitutional. In *Floyd*, a dispute among neighbors resulted in a complaint to the Detroit police. *Id.* at 401–02. Two officers arrived at Floyd's residence while Floyd was at a barbeque. *Id.* at 402. The complaining neighbor told the officers that Floyd had threatened him with a shotgun earlier and had brandished a weapon. *Id.* Floyd arrived home around 8:00 p.m. and parked in his backyard. *Id.* He got out of his car and began walking with his empty hands out in front of him when officers suddenly ran toward him. *Id.* A split second later, the officers began shooting at him without warning. *Id.* We held that the officers' use of deadly force under these circumstances was objectively unreasonable and therefore unconstitutional, because under Floyd's version of the facts, he did not pose a threat of serious physical harm. *Id.* at 407.

Under the Campbells' version of events, *Floyd* is controlling. Mark was in his own home, unarmed, when Fox knocked on his door late in the evening. Though Mark did not make

any threatening gestures indicating a danger of physical harm to others, Fox began repeatedly shooting at him without warning. In both cases, the officers had some reason to believe that the suspect had a weapon. Despite this, we determined in *Floyd* that the officers' use of force was excessive. This finding comports with our caselaw at the time of Fox's use of force, which made clear that merely possessing a weapon, without more, is insufficient to justify the use of deadly force against a suspect. *See Bouggess*, 482 F.3d at 896 ("[E]ven when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified."); *King*, 694 F.3d at 663–64 (concluding that, though an individual was found with a gun after he was killed by an officer, "if [the officer] shot King while he was lying on his couch and not pointing a gun at the officers, [the officer] violated King's clearly-established right to be free from deadly force"); *Thomas*, 854 F.3d at 366 ("To be clear, we do not hold that an officer may shoot a suspect merely because he has a gun in his hand. Whether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances."); *see also Knowlton*, 726 F. App'x at 330–32; *Woodcock*, 679 F. App'x at 424–25. Given this clear precedent and the analogous facts of *Floyd*, any reasonable officer in Fox's position would know that using deadly force, under the circumstances that the Campbells have asserted, was unconstitutional.

The dissent takes a different approach to the "clearly established" question, focusing on whether Fox was on notice that he seized the Campbells. Dis. Op., at 23–24. When Fox fired his weapon, he knew one of two things would occur: either he would hit someone, or he would not. If he did shoot someone, then there is clearly established law that this is a seizure. *See Bouggess*, 482 F.3d at 889. If he missed, then it was clearly established that a seizure occurs if a reasonable person would have believed he was not free to leave in response to Fox's gunshots. *See Brendlin*, 551 U.S. at 255. As discussed, *Ewolski*, decided sixteen years before this incident, established that a reasonable person would not feel free to leave in response to police surrounding his home. *See* 287 F.3d at 506. Therefore, Fox was on fair notice that by shooting at the Campbell's home, he effectuated a seizure. Therefore, Fox is not entitled to qualified immunity at the summary judgment stage.

### IV

Accepting the Campbells' version of events, as we must in this interlocutory appeal, Fox used deadly force while conducting a welfare check, shooting eight times into the home of two unarmed nonthreatening individuals without warning. The "fortuity that [Fox's] shot[s] failed to strike [the Campbells]" does not take this case out of the Fourth Amendment's protection against unreasonable seizures. *Floyd*, 518 F.3d at 407. The Campbells were seized when Fox shot at their house, thereby restricting their freedom to leave. There remains a genuine dispute of material fact regarding how Mark appeared to officers that night, but in the light most favorable to the Campbells, Fox's use of deadly force was clearly excessive and unconstitutional. The district court properly determined Fox was not entitled to qualified immunity at the summary judgment stage. We affirm.

Dissent Omitted due to size of Exhibit.

[illegible]