# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| RYAN MART ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:23-cv-01309 |
| | ) | Judge Aleta A. Trauger |
| CHEATHAM COUNTY SHERIFF'S | ) | |
| DEPARTMENT, SHERIFF TIM | ) | |
| BINKLEY, CHEATHAM COUNTY | ) | |
| JAIL, MUNICIPAL GOVERNMENT | ) | |
| OF CHEATHAM COUNTY, | ) | |
| DEPUTY ZACHARY ROESLER, | ) | |
| DEPUTY MICHAEL D. MEALER and | ) | |
| DEPUTY JOHN DOE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendants Cheatham County, Tennessee (the "County"), Sheriff Tim Binkley, Deputy Zachary Roesler, and Deputy Michael D. Mealer (collectively, the "moving defendants"). (Doc. No. 31.) For the reasons set forth herein, the motion will be granted.

## I.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* That is, even if the nonmoving party fails to respond, or responds inadequately, summary judgment is appropriate only if the moving party meets its burden of establishing that it is entitled to judgment

as a matter of law based on the undisputed material facts. Fed. R. Civ. P. 56(e); *see also Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 380–81 (6th Cir. 2011) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden." (quoting *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991)).

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court generally must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at

255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

It is well accepted that, when video evidence is available, the court may consider such evidence. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) (establishing the value of video footage in resolving factual disputes between the parties). In this context, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*; *see also Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) ("To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." (citing *Scott*, 550 U.S. at 380)). On the other hand, if the "facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits*, 878 F.3d at 547 (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)). The central issue remains "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II. PROCEDURAL HISTORY

Plaintiff Ryan Mart Anderson filed this lawsuit on December 12, 2023 against the County, Sheriff Binkley, and Deputies Roesler and Mealer. (Doc. No. 1.) Also named as defendants are an unidentified Deputy John Doe, the Cheatham County Sheriff's Department, and the Cheatham County Jail. (*Id.*) On December 13, 2023, the plaintiff filed an Amended Complaint, adding only

the plaintiff's Verification, swearing to the truth of the statements in the Amended Complaint. (Doc. No. 5, Am. Compl. 9.) The plaintiff's claims arise from an incident that occurred on December 13, 2022, when he was arrested by Cheatham County Sheriff's Department deputies. He asserts claims under 42 U.S.C. § 1983 for (1) the use of excessive force during his arrest; (2) false arrest and malicious prosecution; and (3) deliberate indifference to his serious medical conditions while he was confined at the Cheatham County Jail. The plaintiff also appears to bring a supplemental state law claim for personal injury. (*See* Am. Compl. 1.)

The moving defendants now seek summary judgment on all claims against them, and they also argue that the claims against defendants John Doe, the Cheatham County Sheriff's Department, and the Cheatham County Jail should be dismissed. Along with their motion (Doc. No. 31), the moving defendants filed a Memorandum of Law (Doc. No. 34-1), Statement of Undisputed Material Facts ("SUMF") (Doc. No. 32), and evidentiary support for their motion, including deposition transcripts and the plaintiff's jail medical records, among other things. In addition, they manually filed a flash drive containing videos from the body worn cameras ("BWCs") worn by the three deputies involved in the plaintiff's arrest and two videos from cameras positioned at the Cheatham County Jail. (*See* Manually Filed Doc. No. 36.)

After having been granted leave to extend the filing deadline, the plaintiff filed his Response to the SUMF on August 13, 2025. (Doc. No. 41.)[1] His Response to the Motion for Summary Judgment, along with another Motion for Extension of Time, was filed on August 26,

---

[1] The Response to the SUMF is not compliant with Local Rule 56.01(e)(2) or (3), insofar as each numbered response does not start with "Undisputed," "Undisputed for Summary Judgment purposes Only," or "Disputed," and the disputed statements do not contain evidentiary citations to support the plaintiff's position. The plaintiff does, however, "admit" many of the statements, and he refers generally to the videos filed by the defendants in disputing most of the non-admitted statements.

2025 (Doc. Nos. 44, 45). The court granted the motion and accepted the delayed filing, but did not grant the plaintiff's counsel's additional request for an extension until September 2, 2025 to file an Amended Response that would be "truly completed with legal references and citations and the exhibit of her Expert's opinions and statements." (Doc. No. 45 at 2; Doc. No. 46.) The defendants filed a timely Reply on September 8, 2025. (Doc. No. 47.) Three weeks later, on September 29, 2025, and nearly six weeks after the original due date, the plaintiff filed another Motion for Extension of Time to Respond to Motion for Summary Judgment (Doc. No. 48), requesting a deadline of October 6, 2025 to file an Amended Response "along with evidence that should have supported the first Response" and a "more detailed response to the statement of undisputed material facts, and a memorandum along with the Response." (Doc. No. 48 at 1.) The defendants opposed the motion, and the court denied it. (Doc. Nos. 49, 50.) The plaintiff has never attempted to file the expert report cited in his Response or to correct obvious errors in his Amended Response. The court finds, however, that correcting these deficiencies would not have made a difference in the court's ruling herein.

## III. FACTS

On December 13, 2022 at around 10:10 p.m., the Cheatham County dispatch received a 9-1-1 call requesting a welfare check at a particular address in Ashland City, Tennessee (hereinafter, the "Property"). (Cheatham County CAD Operations Report, Doc. No. 33-5 at 1.) Specifically, Melissa Monnin called 9-1-1, claiming that her boyfriend, plaintiff Ryan Anderson, was threatening to kill himself, had destroyed the house while threatening to kill himself, and had been drinking for eight days straight while taking Xanax. (*See id.* at 2.) In response to Monnin's 9-1-1

call, defendants Roesler and Mealer— along with Deputy Adam Simon (who is not named as a defendant)—were dispatched to the Property. [2]

The deputies arrived at the Property around 10:27 p.m. (Doc. No. 33-5 at 3.) Roesler approached and knocked on the door of the house, and Anderson opened the door. Roesler asked Anderson if the deputies could come inside, and Anderson voluntarily consented to the deputies' entering the house. Once inside, Roesler had a conversation with Anderson regarding his mental state. Because Anderson denied the intent to commit self-harm or suicide, the deputies exited the home. Monnin, the original caller, and Tammy Hackett, the plaintiff's mother, were also present during the conversation with Anderson regarding his mental state. Although the plaintiff did not express an intent to harm himself while the deputies were present, it was clear to the deputies that he was "highly" intoxicated at the time. (*See, e.g.*, Doc. No. 33-3, Roesler Dep. 53–54; Doc. No. 33-1, Anderson Dep. 111, 113 (confirming that he was "on a bad drinking spree," "screwed up," and "under the influence drunk" on the night in question);[3] *see also* Jail Medical Records, Intake History, Doc. No. 33-11 at 1 (indicating that the plaintiff reported the use of "Xanax, 3 mg/daily" and that he had consumed "1 1/2 pint whiskey" on December 13, 2022).)

After exiting the house, Roesler, Mealer, and Simon remained on the front porch to explain to Monnin and Hackett their options moving forward. They informed the two women that there was nothing the deputies could do at that point, because Anderson did not express any intention to commit self-harm or suicide while in their presence, even though he had expressed such intentions to Monnin and Hackett. (Doc. No. 36, Roesler BWC at 5:13–30.) While the deputies were speaking

---

[2] Facts for which no citation is provided are drawn from the plaintiff's Response to the SUMF (Doc. No. 41) and are undisputed, at least for purposes of the Motion for Summary Judgment.

[3] The deposition transcripts in the record are in condensed form, with four transcript pages per standard page. The court cites herein to the original transcript pagination.

with Monnin and Hackett, Anderson's stepfather, Brian Hackett, arrived at the house and joined the conversation on the front porch. During the front-porch conversation, Monnin, Ms. Hackett, and Mr. Hackett told the deputies that Anderson was "very unstable," that he had "destroyed the upstairs" of Monnin's house,[4] that he was "taking everyone down with him," that he was "just going to be pissed" that they had called the cops, that he was "mad" that Monnin had poured out his liquor, and that he was "dangerous for everybody," among other things. (*Id.* at 5:45–10:15.)[5] Monnin, however, denied that Anderson had ever hit or shoved her or threatened to hurt her. (*Id.* at 8:26–29.)

After several minutes of speaking with the deputies, Ms. Hackett told the deputies she was going back inside to talk with her son. Mr. Hackett told her to "be careful." (*Id.* at 10:23.) Mr. Hackett added, "He's not going to be happy until he hurts her." (*Id.* at 10:26–31.) Moments after going inside, Ms. Hackett cried out, "Officers. . . . Officers!" in an obviously distressed tone of voice. (*Id.* at 10:46–47.) At his point, all three deputies rushed inside—Roesler first, followed by Mealer and then Simon.

Roesler's BWC video shows Ms. Hackett running toward the front door and away from Anderson, who appears to be running after her. (*Id.* at 10:48–49.) Roesler testified that when he pushed open the door, although the camera did not capture it, "it looked like [Anderson] had pushed [Ms. Hackett's] shoulder (indicating) and was still walking towards her." (Roesler Dep. 22.) Ms. Hackett gave a witness statement, signed at 10:55 p.m. the day of the incident, stating: "He just grabbed my arms. He did not hurt me. He just pushed me as I tried to pull away. I yelled

---

[4] During this conversation, Monnin also confirmed that the house was hers but that Anderson had been staying there for several months. (Roesler BWC at 6:11–25.)

[5] The plaintiff states that he "can not admit or deny" that these statements were made, "due to several people talking" (Doc. No. 41, Resp. to ¶ 10), but these statements are clearly audible on the BWC videos.

for the Officers to assist. That's all." (Doc. No. 33-10.) Anderson testified that his mother had recently had surgery on one of her shoulders. (Anderson Dep. 49.) He denied grabbing her but "think[s] [he] . . . put [his] hand on her hurt shoulder" and told her to leave him alone, that he was going to bed. (*Id.* at 52, 138.)

Mealer's body camera video shows that Ms. Hackett stepped to the side in the hallway to allow Roesler to pass her. Roesler can be heard telling Anderson to "get on the ground right now" as he pulled Anderson's right arm toward the ground. (Doc. No. 36, Mealer BWC at 10:42–44.) Anderson stepped backward and into a side table, knocking items off the table, and a confrontation ensued, with all three officers trying to get Anderson to the ground, while Anderson struggled against them. The officers told Anderson several times to put his hands behind his back; his mother can be heard saying, "Ryan, please. Ryan, please calm down." (*Id.* at 11:30–31.)[6] During the incident, Mealer tased Anderson twice. Mealer testified that he deployed the stun gun in "drive stun" mode, which, as he explained, meant that he physically removed the cartridge with the probes, "touch[ed] the connectors" to the plaintiff, and then depressed the trigger. (Doc. No. 33-4, Mealer Dep. 14–16.) In this mode, no probes are discharged. The purpose of deploying a stun gun in drive stun mode is to obtain compliance without "neuromuscular incapacitation." (*Id.* at 16.) If Mealer had not removed the cartridge, the plaintiff "would have been hit with the taser probes, which are . . . a long metal bar that would penetrate the skin." (*Id.*) Mealer also explained that, to be effective, the taser has to make "solid contact" with the person. (*Id.* at 17–18.) He explained that

---

[6] Roesler's body camera goes black at about 11:03, apparently because it fell off of him and face down on the floor while he was interacting with Anderson. He turned the camera over so that it began capturing events again, from the floor, at 11:41. The other deputies' BWCs recorded the interaction without disruption.

> when you heard the loud popping noise from the taser [when his BWC video was replayed], that is an incomplete circuit as far as the effectiveness of the taser. It's making the circuit between the two probes but not going through anything. Once it quiets down in the video, that would be a successful application of the taser in the sense that Mr. Anderson would have received the intended shock that would be, you know, required for the pain compliance.

(*Id.* at 18.) Mealer testified that, when Anderson failed to comply after the first application of the stun gun in "drive stun" mode, he applied it a second time. Once he was "able to get the left arm"—*i.e.*, put a handcuff on the plaintiff's left wrist—he ceased deployment of the taser. (*Id.* at 22–23.)

By 11:44 on Mealer's body camera, just over one minute from the time Ms. Hackett yelled for the officers, the plaintiff was handcuffed and subdued. One of the officers said to him, "Now you're going to jail, partner." (Roesler BWC at 12:10–11.) As soon as the plaintiff was handcuffed, Mealer and Simon stood him up and walked him outside, while Roesler obtained identification from each of the other individuals at the house with whom the officers had been talking. (*Id.* at 12:13–17.) Anderson was transported to the Cheatham County Jail.

The videos are jerky and recorded from close proximity, making it somewhat difficult to ascertain from them exactly what transpired.[7] However, the videos affirmatively show that no officer ever kicked the plaintiff, and they show that the plaintiff did not comply with repeated commands to get on the ground and actively resisted putting his hands behind his back. At approximately 12:58 through 13:08 on Simon's BWC video, just after the plaintiff had been subdued, Monnin can be seen sitting calmly on the couch, expressing no distress over having just seen her boyfriend handcuffed on the floor.

Following the incident, Anderson was charged with Domestic Assault (Tenn. Code Ann. § 39-13-111), Assault on an Officer (Tenn. Code Ann. § 39-13-116), and Resisting Arrest (Tenn.

---

[7] The court has reviewed all three videos repeatedly, at both full speed and half-speed.

Code Ann. § 39-16-602). According to the plaintiff, these charges were ultimately dropped or expunged. (Anderson Dep. 80, 95.) The record does not indicate that they were resolved on the merits.

Sheriff Binkley visited Anderson in jail a few days after his arrest to "check on him," at the request of Ms. Hackett. (Doc. No. 33-2, Binkley Dep. 29.) During this visit, Anderson did not mention to him any injuries incurred during his arrest, though he did say that his ribs hurt. (*Id.* at 30–31.) Binkley made a request to the jail nurse that she look at him and "try to let him see a doctor about getting an x-ray." (*Id.* at 31–32.) According to Binkley, Anderson did not complain that the arresting officers used excessive force, kicked him, or broke his back. (*Id.* at 44.) Although he mentioned his ribs, he was "more concerned about [the sheriff's] trying to get his bond lowered so he could get out of jail." (*Id.* at 58.)

The Jail Medical Records show that the plaintiff had an intake examination on the morning of December 14, 2022, during which his only documented complaint was "R [right] arm pain from arrest." (Doc. No. 33-11 at 2.) On December 16, 2022, Anderson put in a medical request that stated "need pain meds for broken ribs." (*Id.* at 5.) According to a Nursing Protocol note for December 17, 2022, Anderson reported that his "right side hurt[] after being tackled onto hardwood floor" by a police officer during his arrest and that the pain began on December 14, 2022. (*Id.* at 4.) The same note indicates that the nurse contacted the nurse practitioner about a "possible rib fracture" and that the nurse practitioner ordered an x-ray. (*Id.*) The Trident Care Imaging Radiology Report from December 18, 2022 found "normal" "bony ossification of the right ribs," with "no fracture or costovertebral dislocation" or pneumorthorax. (*Id.* at 6.) The conclusion was "[n]ormal right rib series." (*Id.*) No record evidence indicates that the plaintiff complained of back pain during this time frame.

On December 19, 2022, Anderson complained of a right eye contusion from being in a fight with another inmate. (*Id.* at 3.) The two jail videos of the fight clearly show that the plaintiff, aside from getting a black eye and bloody nose, was thrown into a metal bench attached to a metal table, striking it hard with his right lower back and ribs. (*See* Doc. No. 36, Cheatham County Jail video recordings 1 and 2 at 4:02.)[8]

While incarcerated at the jail, Anderson received orders from a physician who contracted with the jail but was not a County employee for Acetaminophen, Ibuprofen, Clonidine, Escitalopram, and Librium; these medications were administered consistent with the physician's orders by the jail nurse, who also was not a County employee. (Doc. No. 33-11 at 19–21.)

Lt. Chris Gilmore reviewed the arrest incident on behalf of the County and determined that the actions taken by the deputies were "appropriate and within the policy and procedure" of the Sheriff's Office. (Doc. No. 33-7; *see also* Binkley Dep. 46 (asked whether he had "any concerns . . . that any of the deputies had used improper force against Mr. Anderson," responding "I think they – it was textbook. I think they [did] . . . what they were trained to do.").)

The plaintiff testified that he believed the officers broke his ribs and his back. He denied injuring his back and ribs in the fight at the jail. The day he got out of jail, he had x-rays and a CT scan done at the Skyline Medical Center emergency room; these allegedly showed a compression fracture in his back and a broken rib. (Anderson Dep. 58–60.) The plaintiff also claims that he was denied treatment after his nose was broken in the fight with another inmate. (*Id.* at 65–67.) The

---

[8] The plaintiff testified during his deposition, upon viewing the same videos, that it "look[ed] like [he] sat down beside" the bench and that the bench was "movable" and would have "move[d] if [he] hit it." (Anderson Dep. 164.) This testimony is clearly contradicted by the video of him hitting the bench and bouncing off of it. (Cheatham County Jail video recordings 1 and 2 at 4:02.)

plaintiff conceded that he was seen by a nurse at the jail five times while he was in jail for nine days. (*Id.* at 67–68.) He denies receiving proper treatment. (*Id.*)

## IV. DISCUSSION

### A. The Sheriff's Department and the Jail

As an initial matter, the moving defendants argue that the claims against the Cheatham County Sheriff's Department and the Cheatham County Jail should be dismissed on the grounds that these are not proper parties suable under 42 U.S.C. § 1983 and, in any event, that the claims against them are redundant to the claims against the County. (Doc. No. 34-1 at 2–3.)

The plaintiff does not respond to this argument, and the moving defendants are clearly correct. Neither the Sheriff's Department nor the jail is a "person" suable as a separate entity under § 1983. *Accord, e.g.*, *Fisher v. Longtin*, No. 3:19-cv-00769, 2019 WL 5694011, at *3 (M.D. Tenn. Nov. 4, 2019) (Richardson, J.) ("[A] sheriff's department is not a 'person' that can be sued under 42 U.S.C. § 1983." (citing *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994))); *Ragan v. Tennessee*, No. 3:14-0392, 2014 WL 648287, at *1 (M.D. Tenn. Feb. 19, 2014) (Campbell, J.) ("A county jail or workhouse . . . is not a 'person' that can be sued under 42 U.S.C. § 1983." (citing *Rhodes v.McDannel*, 945 F.2d 117, 120 (6th Cir. 1991))). The motion for summary judgment will be granted as to these defendants.

### B. Deputy John Doe

The moving defendants also argue that the claims against "Deputy John Doe" must be dismissed, on the grounds that the deadlines for discovery and to amend pleadings expired months ago, but the plaintiff has never sought to amend his pleading to name and properly identify the John Doe defendant. In addition, the statute of limitations has now run as it pertains to the unnamed deputy, because the plaintiff did not comply with Rule 4(m) of the Federal Rules of Civil Procedure to effect service upon the unnamed defendant. (Doc. No. 34-1 at 3.)

The plaintiff does not respond to this argument either, and, again, the defendants are correct. Under Rule 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time," unless the plaintiff "shows good cause for the failure" to effect timely service. Fed. R. Civ. P. 4(m). The plaintiff—who clearly has known for some time that Deputy Adam Simon was the third deputy involved in his arrest—has never sought to obtain service of process on Simon, did not request an extension of the deadline for doing so, and has not shown cause for his failure to effect timely service. The defendant's motion will be granted with respect to Deputy John Doe, but the dismissal will be without prejudice, in compliance with Rule 4(m).

### C.     Claims Against Roesler and Mealer

#### *1.     These Defendants Are Sued in Their Individual Capacities*

These defendants argue, in somewhat of an aside, that the Amended Complaint fails to specify whether the claims are brought against them in their individual or official capacity and, therefore, that the court should presume that they are being sued in their official capacity only. The defendants state that they also address "any potential claims against [them] in their individual capacities" "out of an abundance of caution." (Doc. No. 34-1 at 17.)

In the Sixth Circuit, "[w]hen a complaint is ambiguous over whether a plaintiff has sued state defendants in their personal or official capacities, [the court] will construe it as raising official-capacity claims unless the 'course of proceedings' has clarified that the plaintiff seeks to hold the defendants personally liable." *New Albany Main St. Props. v. Watco Cos.*, 75 F.4th 615, 632 (6th Cir. 2023) (collecting cases). In this case, the Amended Complaint does not expressly state in what capacity Roesler and Mealer are sued, but the Sixth Circuit has never applied a "*per se* rule requiring § 1983 plaintiffs to affirmatively plead 'individual capacity' in the complaint."

*Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc) (citing *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989)). Instead, "'[a]ll a [§ 1983] complaint need do is afford the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Id.* (some internal quotation marks omitted) (quoting *Brooks v. Am. Broad. Cos.*, 932 F.2d 495 (6th Cir. 1991)).

> The Sixth Circuit has explained the "course of proceedings" test as requiring

> consider[ation of] such factors as the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability. The test also considers whether subsequent pleadings put the defendant on notice of the capacity in which he or she is sued.

*Id.* at 772 n.1.

The plaintiff does not respond to this argument either, but it is clear that Roesler and Mealer are sued in their individual capacities. The Amended Complaint identifies them as "individuals" employed by the Cheatham County Sheriff's Office; it sues them for excessive force and false arrest—claims that typically lie against individuals rather than a municipality; and the claims against the individual defendants are distinct from the claims against the County based on an unconstitutional "custom and official policy" of the County and "inadequate training or supervision." (Am. Compl. ¶ 17.) In addition, the plaintiff seeks both compensatory and punitive damages. As the defendants point out, it is well established that punitive damages are not available against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 818 (6th Cir. 2007); *Stacy v. Clarksville Police Dep't*, 771 F. Supp. 3d 1024, 1034 (M.D. Tenn. 2025). Summonses were issued to both the deputy defendants, and they do not contend that they were not properly served. And finally, Roesler and Mealer both raise the defense of qualified immunity based on their "good faith in discharging their duties and act[ing] reasonably under the circumstances" (Doc. No. 9, Answer

¶ 27.) These circumstances establish unambiguously that Roesler and Mealer were sued in their individual capacity and that they had "actual knowledge of the potential for individual liability." *Moore*, 272 F.3d at 772 n.1.

### 2. False Arrest Claim

To prove a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a right, privilege, or immunity secured by the U.S. Constitution or federal law by a person acting under color of state law. *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978)); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). Under the Fourth Amendment, an arrest without probable cause is "unreasonable," U.S. Const. amend IV, and, as such, may support a false arrest claim under § 1983. *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Conversely, where probable cause supports an arrest, the seizure of a person is reasonable under the Constitution. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."). Because the *absence* of probable cause is a necessary element of a false arrest claim under § 1983, the existence of probable cause dooms the claim. *Parnell v. City of Detroit*, 786 F. App'x 43, 47 (6th Cir. 2019) (citing *Voyticky*, 412 F.3d at 677).

Probable cause to arrest is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *D.C. v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). When the facts are undisputed, "the ultimate question of probable cause . . . in a civil case . . . is a question of law for the court."

"The Supreme Court has repeatedly held that the Fourth Amendment permits officers to warrantlessly arrest—that is, to seize, a person if the officer has probable cause to believe that the

suspect has committed a misdemeanor in his presence." *United States v. Jones*, 55 F.4th 496, 500 (6th Cir. 2022) (collecting cases). The first charge at issue here—the one that led to the plaintiff's arrest—is the misdemeanor charge of domestic assault in violation of Tenn. Code Ann. § 39-13-111. Under Tennessee law, a person commits domestic assault if that person "commits an assault as defined in § 39-13-101 against a domestic abuse victim." Tenn. Code Ann. § 39-13-111(b) (effective July 1, 2018 to June 30, 2023). "Domestic abuse victim" is defined to include "[a]dults or minors related by blood or adoption." *Id.* § 39-13-111(a)(4). Under § 39-13-101:

> A person commits assault who:
>
> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>
> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

*Id.* § 39-13-101(a). Assault under any of these subdivisions is a misdemeanor. *Id.* § 39-13-101(b).

The record establishes as a matter of undisputed fact that, while the three deputies were talking on the front porch with the plaintiff's family members, those family members expressed their concerns that Anderson, among other things, was "very unstable," had "destroyed the upstairs" of Monnin's house, was "taking everyone down with him," would be "pissed" that they had called the police, was "mad" that Monnin had poured out his liquor, and was "dangerous for everybody." (Roesler BWC at 5:45–10:15.) When Ms. Hackett went inside to speak again with Anderson, her husband advised her to "be careful." (*Id.* at 10:23.) He added, to the officers, that Anderson was "not going to be happy until he hurts her." (*Id.* at 10:26–31.) Within seconds after she went inside, the officers heard Ms. Hackett cry out in a tone of distress and alarm. (*Id.* at 10:46–47.) The Roesler BWC video does not explicitly show Anderson touching Ms. Hackett, but it shows her running away from him, toward the front door, while Anderson appears to be pursuing

her. (*Id.* at 10:49–10:50.) These circumstances—including Ms. Hackett's and the others' statements about Anderson's mental state, Ms. Hackett's distressed cry, and her running away from Anderson—were sufficient to create probable cause to believe that Anderson had "[i]ntentionally or knowingly cause[d] [Ms. Hackett] to reasonably fear imminent bodily injury," Tenn. Code Ann. § 39-13-101(a)(2), irrespective of whether he, in fact, had the requisite *mens rea* and irrespective of whether he had actually made physical contact with Ms. Hackett or caused bodily injury.[9] Ms. Hackett is his mother, so she qualifies as a domestic abuse victim under § 39-13-111(a)(4). Accordingly, Roesler had probable cause to charge Anderson for domestic assault in violation of Tenn. Code Ann. § 39-13-111(b).

Because probable cause existed for the arrest, the plaintiff's false arrest claim fails as a matter of law, irrespective of whether probable cause existed to support the other two charges. As the Sixth Circuit has explained:

> If the facts known to the officers support probable cause in any form, then an individual may lawfully be arrested. So it follows that when an officer arrests someone based on multiple charges, it is not relevant whether probable cause existed with respect to each individual charge. What matters is the validity of the *arrest* (the seizure) and not the validity of every *charge* (the potential justifications for the seizure). As long as the arrest is supported by probable cause on one charge, then a false arrest claim cannot move forward.

*Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020) (emphasis in original) (internal citations omitted); *see also Howell v. McCormick*, 148 F.4th 834, 849 (6th Cir. 2025) ("[A] claim alleging an unconstitutional false arrest will fail as long as the officers had probable cause for one of these offenses." (citing *Howse*, 953 F.3d at 409)).

Roesler and Mealer are entitled to summary judgment on the plaintiff's false arrest claim.

---

[9] The court reiterates here that Anderson admitted in his deposition that he "put [his] hand on her hurt shoulder." (Anderson Dep. at 52.)

### 3. Malicious Prosecution Claim

The defendants, apparently giving the plaintiff the benefit of the doubt, construe the Amended Complaint as stating, or possibly stating, a claim for malicious prosecution. (*See* Doc. No. 34-1 at 25.) To defeat summary judgment on a malicious prosecution claim, the plaintiff must present facts sufficient to establish four elements: (1) the defendant officer "made, influenced or participated in" the prosecutorial decision; (2) there is a "lack of probable cause" for the challenged charges; (3) the prosecution caused a "deprivation of liberty . . . apart from the initial arrest"; and (4) "the prosecution ended without a conviction." *Howell*, 148 F.4th at 852–53 (citations omitted). Moreover, "the Supreme Court has now clarified that courts must take a charge-by-charge approach to malicious prosecution (unlike false arrest)." *Id.* at 853 (citing *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024)).

In this case, as discussed above, the officers had probable cause for the domestic assault charge, which defeats any malicious prosecution claim related to that charge. There was also probable cause to support the charge of resisting arrest, in violation of Tenn. Code Ann. § 39-16-602. Under that statute, an individual commits the offense of resisting arrest where the "person intentionally prevent[s] or obstruct[s] anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another." Tenn. Code Ann. § 39-16-602(a). Except in the case of self-defense, an unlawful arrest is not a defense to resisting arrest. *State v. Forkpa*, No. E2019-01605-CCA-R3-CD, 2020 WL 6707659, at *6 (Tenn. Ct. Crim. App. Nov. 16, 2020) (citing Tenn. Code Ann. § 39-16-602(b)). "Force" is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a); *State v. Forkpa*, No. E2019-01605-CCA-R3-CD, 2020 WL 6707659, at *6 (Tenn. Ct. Crim. App. Nov. 16, 2020). Under Tennessee law, the element of

force is construed "broadly," and courts have "consistently held that a defendant's efforts in preventing an officer from handcuffing him are sufficient to support the element of force." *Id.* at *7 (collecting cases).

The court has reviewed the videos and finds that no reasonable juror could view these videotapes and conclude that the officers lacked probable cause to believe that the plaintiff was attempting to avoid being handcuffed. Anderson himself testified that he "did resist" being handcuffed, purportedly to "keep [his] arm from getting dislocated." (Anderson Dep. 86.) The videos establish that Anderson bucked and squirmed while the deputies were trying to handcuff him, and he refused to place his hands behind his back despite repeated commands to do so. Even after the officers had hold of his left hand, Roesler visibly was required to use a significant amount of strength to pull the plaintiff's right hand behind his back. (*See, e.g.*, Mealer BWC at 11:24–29; Doc. No. 36, Simon BWC at 12:41–45.) Roesler, in other words, had probable cause to charge the plaintiff with resisting arrest under Tennessee law, and the malicious prosecution claim arising from that charge necessarily fails.

Finally, the plaintiff was charged with assaulting a police officer in violation of Tenn. Code Ann. § 39-13-116. The video does not affirmatively show that the plaintiff assaulted a police officer, and the plaintiff denies doing so. (Anderson Dep. 80.) However, irrespective of whether probable cause existed for this charge, the plaintiff must also establish that prosecution on this particular charge caused a "deprivation of liberty . . . apart from the initial arrest." *Howell*, 148 F.4th at 853. Here, the plaintiff has not alleged or shown that he spent any additional time in jail solely because of the § 39-13-116 charge.

In addition, as the Sixth Circuit also concluded in *Howell*, even if the defendants lacked probable cause for the § 39-13-116 charge and even if that charge resulted in additional jail time,

the officers would be entitled to qualified immunity. If a defendant raises the defense of qualified immunity, "the plaintiff must show that a defendant's probable-cause finding violated clearly established law." *Lester*, 986 F.3d at 612 (citing *Wesby*, 583 U.S. at 62–63). In 2022, at the time Anderson was arrested, *Chiaverini* had not yet been decided, and, prior to *Chiaverini*, it was well established in the Sixth Circuit that "probable cause on one charge categorically forecloses malicious-prosecution claims in multicount cases." *Howell*, 148 F.4th at 854.

In sum, the defendants are entitled to summary judgment on the plaintiff's malicious prosecution claim.

### 4. *Excessive Force*

"The Fourth Amendment's guarantee against unreasonable seizures encompasses a protection against use of excessive, or unreasonable, force 'in the context of an arrest or investigatory stop.'" *King v. City of Rockford*, 97 F.4th 379, 393 (6th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). "The reasonableness of a use of force is assessed from the perspective of a reasonable officer on the scene without the benefit of '20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97). "Determining whether the force used is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quotation marks and citation omitted). In the context of a motion seeking summary judgment on an excessive force claim, the court must consider the "totality of the circumstances, including, but not limited to: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *King*, 97 F.4th at 393 (internal quotation marks and citations omitted).

In light of these factors, Sixth Circuit law is clear that the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional. *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (holding that multiple blows with a nightstick were unneeded and excessive where suspect was handcuffed and not trying to escape or hurt anyone); *see also Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004) ("[E]ven minor uses of force are unconstitutionally excessive if they are 'totally gratuitous.'"). Thus, for example, using a stun gun or pepper spray on a suspect who is already handcuffed and no longer poses a threat to the safety of the officers or others constitutes excessive force. *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) (collecting cases).

At the same time, "it is not excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (collecting cases). The Sixth Circuit has defined "active resistance" as "physically struggling with, threatening, or disobeying officers" and actions involving "physical resistance." *Id.*

And, as set forth above, when the best evidence available is video recordings, if the "facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits*, 878 F.3d at 547. However, "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Id.* (citations omitted).

Where, as here, an interaction allegedly involves "multiple uses of force" by multiple individuals, the court must view each officer's actions individually and must "analyze[] the subject event in segments." *King*, 97 F.4th at 393 (citations omitted). The plaintiff's first excessive force

argument is premised upon his claim that the officers lacked probable cause to arrest him in the first place, as a result of which *any* use of force was excessive. As discussed above, however, the arrest was supported by probable cause.

Second, the plaintiff testified in his deposition that he was "assaulted" by the officers and "tackled" "[f]rom behind," with no warning or notice that he was being arrested, aside from one officer stating, "that's an assault." (Anderson Dep. 57–58.) This allegation is clearly refuted by BWC videos, which show that the plaintiff was advancing toward his mother when the officers opened the door and ran inside and that Anderson was still facing Roesler with his arm out when Roesler demanded that he "get on the ground." (Roesler BWC at 10:48–51; *see also* Mealer BWC at 10:42–44.)

The plaintiff next claims that he did not resist but that the officers "got on top of him" after "wrestl[ing] him to the ground." (Doc. No. 44 at 2.) Although all of the videos are unclear, if any of the officers did get on top of Anderson to push him to the ground, they did so very briefly. After the plaintiff was on the ground, the officers can be seen kneeling on either side of him. (*See, e.g.*, Mealer BWC at 11:03–07; Simon BWC at 12:40.) The plaintiff claims that, after the officers had gotten his left hand cuffed, he "could not get the other one out from under his body" and therefore "could not follow their commands to pull the other hand up with their weight on top of him." (Doc. No. 44 at 2; *see also* Anderson Dep. 58 ("The other arm was stuck up under me with them sitting on top of me and them saying, get your arm out. I couldn't get my arm out.").) This allegation, too, is clearly contradicted by the videos, which show that Roesler and the other officers were at Anderson's side (not on top of him), with Roesler trying to pull Anderson's right arm behind his back, while Anderson resisted. (Mealer BWC at 11:24–29; Simon BWC at 12:41–45.) In addition, the plaintiff admitted that he resisted being handcuffed. (Anderson Dep. 86.) The plaintiff's claim

that the "large dark bruise" that he observed on his side after his arrest must have been caused by an officer's boot (*see* Doc. No. 5-4; Anderson Dep. 80) is also belied by the videos, which show that no officer ever kicked him or was in position to have placed a boot against his side.

The plaintiff's excessive force claim rests, finally, on the fact that Deputy Mealer used a taser while the deputies were attempting to handcuff him. During his deposition, the plaintiff expressed his belief that Mealer pressed the taser into his back so hard that it broke his back.[10] (Anderson Dep. 81–82.) The defendants argue both that (1) Mealer's use of the taser in "drive stun" mode was objectively reasonable under the circumstances; and (2) they are entitled to qualified immunity, because it was not clearly established as of 2022 that "using a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force," *Hagans*, 695 F.3d at 509 (6th Cir. 2012).

The defense of qualified immunity presents two questions: (1) whether Mealer violated Anderson's Fourth Amendment rights by repeatedly tasing him whileAnderson actively resisted arrest; and, if so, (2) whether that constitutional right was clearly established in December 2022, when the tasing occurred. *See id.* at 508. As to the first question, as set forth above, the Sixth Circuit has affirmatively stated that "it is not excessive force for the police to tase someone (even

---

[10] Although the plaintiff alleges that an x-ray performed after he was released from jail showed a vertebral compression fracture (Anderson Dep. 58–59), he has presented no competent medical evidence that the pressure of a stun gun under the circumstances presented here could have fractured a vertebra. Even if the plaintiff's allegation, standing alone, were sufficient to prove causation, "[i]n determining whether there has been a violation of the Fourth Amendment, [the court must] consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Hagans*, 695 F.3d at 511 (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010)). In other words, the question presented is whether the use of the stun gun was constitutionally permissible.

It also bears noting that, the plaintiff's contentions to the contrary notwithstanding, the jail videos clearly show the plaintiff striking his lower back and right side quite hard against the metal bench during the jail fight.

multiple times) when the person is actively resisting arrest." *Rudlaff*, 791 F.3d at 641. In that case, the plaintiff had "locked up his body ('ball [ed] up') and admittedly refused to give [the defendant] his hands. And, pivotally, he admitted at his deposition that he tried to prevent [the officer] from handcuffing him—*i.e.*, he conceded that he resisted arrest." *Id.* at 642. Because the plaintiff had "'actively resist[ed] arrest and refus[ed] to be handcuffed,'" the officers' use of a taser was constitutionally reasonable. *Id.* (quoting *Hagans*, 695 F.3d at 509). District courts within the Sixth Circuit have reached similar conclusions under similar circumstances. *See, e.g.*, *Alexander v. City of Shelby Twp.*, No. 07-cv-14741, 2009 WL 3241974, at *2 (E.D. Mich. Oct. 8, 2009); *Wylie v. Overby*, No. 05-CV-71945-DT, 2006 WL 1007643, at *8 (E.D. Mich. Apr. 14, 2006); *Devoe v. Rebant*, No. 05-71863, 2006 WL 334297, at *6 (E.D. Mich. Feb.13, 2006).

Likewise in this case, the court finds that Mealer's use of the taser in drive-stun mode twice was objectively reasonable, given that the plaintiff was actively bucking and squirming while the deputies were trying to handcuff him, ignored repeated commands to place his hands behind his back, and admittedly resisted while Roesler tried to pull his right arm behind his back. The police were also aware that the plaintiff was highly intoxicated, and they had been told by his family members that he posed a danger and had been behaving erratically. Moreover, there is no dispute that, once the deputies had hold of his left hand, Mealer put the taser away and did not use it again. This is not a situation in which a taser was deployed on an arrestee who was already subdued and passive. The defendants did not use excessive force in violation of the Fourth Amendment, and the plaintiff's supplemental state law "personal injury" claim (*see* Am. Compl. ¶ 5), which depends on the validity of the excessive force claim, also fails on the undisputed facts.

Finally, even if the plaintiff had succeeded in creating a material factual dispute as to whether the degree of force used was excessive, the defendants are entitled to qualified immunity

unless their conduct violated clearly established law regarding the use of a taser. The plaintiff bears the burden of proof on this issue, and to carry it he must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Wesby*, 583 U.S. at 64 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). As of the time of the plaintiff's arrest, it was not clearly established that "using a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force." *Hagans*, 695 F.3d at 509. Instead, the Sixth Circuit had by then repeatedly acknowledged that, when a close call is presented, "[t]he essence of qualified immunity . . . is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." *Id.* at 511. And, as of 2022 (as in 2009, when the incident underlying *Hagans* occurred), the Sixth Circuit had never held that "officers used excessive force by tasing suspects who were actively resisting arrest," even when the arrestees were "suspected of innocuous crimes, posed little risk of escape and had not yet physically harmed anybody." *Id.* The plaintiff has not pointed to any clearly established law that would have alerted the defendants that the use of a taser in drive-stun mode against a plaintiff who was actively resisting being handcuffed violated his constitutional rights. *Accord King*, 97 F.4th at 397 ("Under the circumstances faced by [the defendant], we cannot say that 'every reasonable official would have understood' that [the plaintiff's] behavior did not rise to active resistance and thus that the takedown violated the Fourth Amendment." (quoting *Zakora v. Chrisman*, 44 F.4th 452, 465 (6th Cir. 2022)).

For this reason, too, the defendants are entitled to summary judgment on the excessive force claim. For the same reasons, they are also entitled to qualified immunity from the "personal injury" claim under Tennessee law. *Accord Hux v. Williams*, 751 F. Supp. 3d 885, 898 (E.D. Tenn. 2024) (citing *City of Mason v. Banks*, 581 S.W.2d 621, 626 (Tenn. 1979)).

**D.      Claims Against the County and Sheriff**

Section 1983 creates a federal cause of action against any "person" acting under color of state law who deprives another person of a federal right. 42 U.S.C. § 1983. A municipality is considered a "person" subject to liability under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Under *Monell*, a municipality is liable for a constitutional violation if "execution of the municipality's policy or custom inflicts the alleged injury." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008); *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) ("To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom."). Axiomatically, a municipality cannot be liable under § 1983 unless the plaintiff establishes an underlying constitutional violation. *Griffith v. Franklin Cnty.*, 975 F.3d 554, 581 (6th Cir. 2020). And even if the plaintiff establishes a constitutional violation, a municipality cannot be held liable under § 1983 simply because it employs a tortfeasor, nor can it be liable "for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694; *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*."). Instead, a municipality may be held liable "only for '[its] own illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

Thus, a plaintiff asserting a municipal liability claim under *Monell* "must connect the employee's conduct to a municipal 'policy' or 'custom.'" *Gambrel v. Knox Cnty.*, 25 F.4th 391, 408 (6th Cir. 2022) (quoting *Brown*, 520 U.S. at 403). To do so, a plaintiff must establish at least one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence

of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). A plaintiff then "must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404.

Anderson brings *Monell* claims against the County[11] based on allegations that the County has "tolerated a custom of officers engaging in excessive force to the injury of members of the public with exaggerated and false charges and physical harm." (Am. Compl. ¶ 17.) In support of this claim, he asserts that "[t]his is just the third time in about half a dozen years that [the County has] been sued for such excessive force and false arrest." (*Id.*) However, because the plaintiff has failed to establish that his Fourth Amendment rights were violated, he cannot pin liability for any such violation upon the County. And even if he had established a Fourth Amendment violation, the plaintiff has not presented any evidence from which a reasonable jury could conclude that a municipal policy or custom was the moving cause behind that violation. The only purported "evidence" to which he points consists of two excessive force claims against other Cheatham County officers based on completely dissimilar incidents that took place in 2016 and 2018. These two dissimilar incidents, even if the court accepts them as true, do not qualify as sufficient evidence of any kind of a municipal policy or custom that may have existed in 2022.

The plaintiff also asserts that the County is liable for the jail's deliberate indifference to his serious medical needs. Pretrial detainees have a constitutional right to be free from deliberate

---

[11] The Sheriff is named as a defendant as well, but the plaintiff clearly sues him in his official capacity only. (*See, e.g.*, Doc. No. 12, Initial Case Management Order 3.) A claim against the Sheriff in his official capacity is equivalent and redundant to a claim against the County. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *id.* at 167 n.14 ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly for damages and injunctive or declaratory relief."). Accordingly, the court dispenses with reference to the official-capacity claims in this analysis.

indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment. *Griffith*, 975 F.3d at 566 (6th Cir. 2020). "To survive summary judgment on a deliberate indifference claim, a plaintiff must 'present evidence from which a reasonable jury could find that (1) that [the detainee] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to' the detainee." *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022) (alterations in original) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 597 (6th Cir. 2021)).

Here, the court assumes for purposes of summary judgment that the injuries the plaintiff allegedly sustained during his arrest and during the fight with another inmate constitute objectively serious medical needs. The plaintiff, however, does not present any evidence suggesting that the Sheriff or any jail employee or contractor knew about and deliberately or recklessly ignored those needs. Instead, when the plaintiff and his mother complained to the Sheriff that the plaintiff's ribs hurt, the Sheriff made a request to the jail nurse that she examine Anderson and "try to let him see a doctor about getting an x-ray." (Binkley Dep. 31–32.) "[A] non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to [a] medical professionals' opinions.'" *Greene*, 22 F.4th at 608. And Anderson admits that he was seen by a nurse—who is not named as a defendant—four or five times while he was in jail for nine days. (Anderson Dep. 67–68.) While in jail, he received an x-ray, which provided no evidence of a fracture, and he also received Ibuprofen and Acetaminophen for pain. The plaintiff has presented no evidence that he needed different or more intensive treatment, that the jail medical personnel

(or the County) knew or should have known that he needed more intensive treatment, or that jail medical personnel (or the County) should have known that the x-ray results were incorrect.

The County is entitled to summary judgment, and the official-capacity claims against the Sheriff are likewise subject to dismissal.

## V. CONCLUSION

For the reasons set forth herein, the defendants' Motion for Summary Judgment will be granted, and this case will be dismissed in its entirety. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge